UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

SEBASTIAN CORREA MORALES,

                *Petitioner,*

    – against –

JULIANA ESCOBAR RESTREPO,

                *Respondent.*

**FINDINGS OF FACT &
CONCLUSIONS OF LAW**
25-cv-06998 (NCM) (TAM)

---

**NATASHA C. MERLE**, United States District Judge:

Before the Court is petitioner's second Verified Petition for the Return of Child to Colombia ("Petition") against respondent pursuant to The Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention" or "Convention") and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001 *et seq.* Pet., ECF No. 1; *see also Morales v. Restrepo*, No. 24-cv-07951, 2025 WL 939294 (E.D.N.Y. Mar. 28, 2025) ("*Restrepo I*"), *appeal filed*, 25-806 (2d Cir. Apr. 7, 2025). Petitioner seeks return of the parties' now six-year-old child, L.C., to Colombia from New York, where L.C. currently resides with respondent. For the reasons stated below, the Court finds that respondent wrongfully removed L.C. to New York on December 3, 2025, in violation of the Convention. Accordingly, the Court **GRANTS** the Petition and orders the return of L.C. to Colombia.

## BACKGROUND

### I.      Findings of Fact

Pursuant to Federal Rule of Civil Procedure 52, the Court finds the following facts based on its review of the trial record. Fed. R. Civ. P. 52(a)(1). Unless otherwise indicated, the parties have established the following facts by a preponderance of the evidence. That evidence includes live testimony and documentary exhibits admitted at trial. The Court takes judicial notice of its decision and proceedings in *Restrepo I. See Clarkstown Recycling Ctr., Inc. v. Parker, Chapin Flattau & Klimpl, LLP*, 1 F. Supp. 2d 327, 328 n.1 (S.D.N.Y. 1998) ("Th[e] [c]ourt can take judicial notice of a related proceeding.") (first citing *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 157 (1969); and then citing *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991)).

### A. Child's Return to Colombia

On April 18, 2025, L.C. was returned to Medellín, Colombia pursuant to an Order of Return by the Court. Tr. 20:21–25;[1] *see Restrepo I*. Both parties accompanied L.C. from New York to Medellín. Tr. 21:3–8. After their arrival in Colombia, respondent exercised physical custody over L.C., *see* PX3; PX4,[2] and L.C. resided at respondent's mother's residence, *see* Tr. 23:11–13, 243:21–24.

### B. Colombian Court & Administrative Proceedings

Shortly after L.C.'s return to Colombia, petitioner commenced a "conciliation" process before a private entity—the Avancemos Conciliation Center—in an attempt to

---

[1]      The transcripts for the two-day Hearing, ECF Nos. 71, 72, are herein referred to collectively as the "Transcript."

[2]      Throughout this Order, petitioner's exhibits are referred to as "PX1," PX2," and so on; respondent's exhibits are referred to as "RXA, RXB," and so on.

reach an agreement regarding L.C.'s custody and to establish a visitation schedule. Tr. 23:19–24:4; 264:1–12; *see* PX15. During a conciliation hearing held on May 7, 2025, the parties reached a partial settlement in which they agreed to share parental authority over L.C. Tr. 24:3–9; *see* PX15. The parties were unable to agree to an in-person visitation schedule, *see* Tr. 24:10–14, but petitioner maintained contact with L.C. via WhatsApp, *see* PX15; *see also* Tr. 23:22–25.

The following week petitioner submitted a Request for Verification of Rights to the Family Affairs Office of the Municipality of Itagüí ("Family Affairs Office"). Tr. 24:16–17; PX15. Petitioner sought to reestablish his parental and custodial rights, as well as L.C.'s rights, including L.C.'s right to be enrolled in school in Colombia and to have physical contact with his paternal family. PX15; Tr. 24:21–25:2; *see* Tr. 257:9–17. By decision dated July 4, 2025, the Family Affairs Office concluded that rights to custody and personal care were violated because petitioner was prevented from playing an active role in L.C.'s upbringing and education. PX15; Tr. 260:10–14. The Family Affairs Office opened an administrative investigation to restore L.C.'s rights. PX15. The decision from the Family Affairs Office also put in place a provisional visitation schedule in which petitioner was granted visitation two weekends a month and for two hours on one weekday every week. PX15; Tr. 26:10–27:13, 245:8–11.

In or around May 29, 2025, respondent filed a request to relocate L.C. to the United States through a "tutela" action before the Third Municipal Criminal Court in Itagüí. Tr. 248:7–12, 253:16–254:2; PX12. By decision dated June 16, 2025, the court denied respondent's request on the grounds that it was not the proper entity to decide the request, and instead, respondent should raise her request before a family court. Tr. 254:6–9, 255:18–256:1, 262:9–12; PX12.

On September 16, 2025, the parties formalized their divorce through a mutual agreement. Tr. 28:9–16, 246:14–16. The agreement was ratified by a judgment entered by the First Family Court of Itagüí. PX18 ("Divorce Decree" or "Decree"). The Divorce Decree codified the parties' custodial rights over L.C. *See* Tr. 30:3–31:7. It contains the following provisions:

> FOURTH: TO APPROVE the CONCILIATION AGREEMENT regarding the duties and rights of the child in common, [L.C.] . . .
>
> 1. PHYSICAL CUSTODY: The child will continue to live with his mother in the Medellín metropolitan area, in a place that Sebastían declares to be known to him, with JULIANA being requested to inform the father of any change in the child's residence. . . .
>
> 3. VISITATION ARRANGEMENTS:
>
>> a. WEEKENDS: The child may stay overnight with his father every fifteen (15) days, for which he will pick him up at 5 p.m. on Fridays and return him at 6 p.m. on Sundays or Mondays if it is a holiday.
>>
>> b. DURING THE WEEK: The father may visit his son [L.C.] during the week at his place of residence, picking him up at 5:00 p.m. and returning him at 7:00 p.m. on Tuesdays and Wednesdays of the week that the child is not spending with him. The week that SEBASTIÁN has his son during that weekend, he will only pick him up on Wednesday, at the same time. . . .
>
> JUILANNA ESCOBAR RESTREPO states that the agreement reached here regarding the duties and rights of [L.C.] *does not imply* a waiver of the right to go before the administrative and/or ordinary courts to request a residence permit in another country for her son [L.C.]

PX18 (emphasis in original).

On September 30, 2025, respondent filed her own conciliation request seeking petitioner's permission to reestablish L.C.'s residence in the United States. Tr. 38:21–39:12; PX20; *see* Tr. 266:3–22. A hearing was held on respondent's request on October 31, 2025. PX20. The conciliation process was unsuccessful; petitioner refused for L.C. to be relocated to the United States and to revise the visitation agreement to be adapted to L.C. living in the United States. Tr. 40:14–41:2, 266:11–22; PX20.

On November 28, 2025, the Family Affairs Office resolved its administrative investigation into the restoration of L.C.'s rights. Tr. 31:8–16, 261:5–8; PX27. The Family Affairs Office ordered the parties to cease from taking any action which could harm L.C., and further ordered the parties to comply with the Divorce Decree. Tr. 31:25–32:2; PX27. On January 19, 2026—after L.C. was removed to the United States—the Family Affairs Office issued another decision. *See* PX29. Petitioner informed the Family Affairs Office that L.C. had been taken to New York. Tr. 36:3–8; *see* PX29. The decision from the Family Affairs Office reiterated that parental authority was currently vested in both parents, Tr. 35:4–14, 261:22–262:3; PX29, and further clarified that none of the Office's prior decisions constituted authorization for L.C. to leave the country or for respondent to reestablish L.C.'s residence abroad, Tr. 36:23–37:14, 262:4–8; PX29.

### C. April 2025 – December 2025: L.C.'s Life in Colombia

From his return on April 18, 2025, to December 3, 2025, L.C. resided exclusively in the metropolitan area of Medellín, Colombia. Tr. 41:11–13; *see* Tr. 251:16–20. Following the first Family Affairs Office decision, L.C. stayed with petitioner every other weekend and visited with petitioner during the week. Tr. 26:25–28:8, 83:8–14; PX15; PX18. Otherwise, L.C. primarily lived with respondent at her mother's home in Itagüí. *See* Tr. 23:11–13, 243:21–244:1. While living in Colombia, L.C. received medical care;

attended school; participated in activities such as horseback riding, tennis, boxing, and soccer lessons; had playdates with friends; and visited with extended family. Tr. 45:16–47:4, 54:16–55:15, 57:10–23, 58:14–22; PX1. L.C. was enrolled in health insurance in Colombia from his return in April 2025 through November 2026. Tr. 46:10–19, *see also* Tr. 253:8–11.

### D. December 3, 2025 Removal

In August of 2025, respondent sought information from the Colombian consulate in New York about how to obtain a certificate of United States residence for L.C. Tr. 267:4–7. In her request, respondent represented that L.C. lived continuously in the United States from January 26, 2024 to April 18, 2025, but was sent back to Colombia due to lies told by petitioner. Tr. 267:8–12. Respondent did not inform the consulate about the Court's decision and Order of Return in *Restrepo I*. Tr. 267:13–16. On or about October 15, 2025, petitioner obtained a certificate of residency from the consulate stating that L.C. had habitual residence of at least one year in New York. Tr. 268:25–269:14; *see also* RXK. Respondent provided this certificate to authorities in order to leave Colombia with L.C. on December 3, 2025. Tr. 247:6–19. On December 12, 2025, petitioner discovered that respondent had left Colombia with L.C. without petitioner's permission, and respondent e-mailed petitioner informing him that L.C. was no longer in Colombia and that L.C. returned to the United States with respondent. Tr. 58:23–59:12.

## II. Procedural History

### A. First Hague Convention Proceeding

Petitioner commenced the first Hague Convention proceeding on November 15, 2024, seeking return of L.C. to Colombia following an alleged unlawful retention in the United States beginning on May 16, 2024. *Restrepo I*, 2025 WL 939294, at *1, *5. The

6

Court held a two-day hearing on February 24 and 25, 2025, at which seven witnesses testified. *Id.* at \*5. The parties presented evidence as to L.C.'s life in the United States, including the time between January and May 2024, immediately prior to the unlawful retention. *See id.* at \*10. By decision dated March 28, 2025, the Court found that L.C. was unlawfully retained in the United States in violation of the Convention and ordered L.C. returned. *Id.* at \*14. The Court directed the parties to submit a joint proposed order of return by April 4, 2025. *Id.* at \*14.

On April 7, 2025, respondent filed a notice of appeal of the Court's decision in *Restrepo I. See Morales v. Restrepo*, No. 24-cv-07951, 2025 WL 1070234, at \*1 (E.D.N.Y. Apr. 9, 2025). Respondent moved for a stay of the Court's Order of Return pending her appeal to the Second Circuit. *See id.* The Court denied respondent's motion, but issued an administrative stay until April 14, 2025, to permit respondent to seek a stay from the Second Circuit. *Id.* The Court further ordered that "[b]arring such a stay . . . . [t]he child shall be returned to Colombia no later than April 18, 2025." *Id.* at \*5. The Second Circuit did not issue a stay, and L.C. was returned to Colombia on April 18, 2025. *Morales v. Restrepo*, No. 24-cv-07951 (E.D.N.Y. Apr. 19, 2025), ECF No. 75.

### B. Instant Proceeding

Petitioner filed this action against respondent pursuant to the Convention on December 19, 2025, seeking return of L.C. to Colombia. Pet. ¶¶ 1, 6. Petitioner moved for expedited proceedings and a temporary restraining order ("TRO") against respondent. Pet.'s Mot. to Expedite Proceedings and TRO, Prelim. Inj., ECF No. 6 ("Motion"). The Court directed respondent to show cause why the Court should not grant the relief requested in the Motion and issued a TRO prohibiting respondent from removing the child from the State of New York and directing respondent to deposit L.C.'s passports and

7

travel documents with the Clerk of Court pending resolution of the Petition. Order to Show Cause and TRO, ECF No. 7.

Thereafter, the Court held a two-day hearing on the Petition on February 11 and 12, 2026 (the "Hearing"). Five witnesses testified in person or via remote access: the parties (in person); Mariana Garcia Jimeno (remote); Euijin Jung (remote); and Sandra Alzate Molina (remote). *See generally* Tr.; *see also* Pet.'s Prelim. Witness List, ECF No. 55; Respt's Witness List, ECF No. 57. At the close of the Hearing, the Court encouraged the parties to discuss the possibility of settling their dispute without Court intervention given the narrow legal question presented pursuant to the Convention. Tr. 309:2–19.

## DISCUSSION

### I.   Applicable Law

#### A.  *Hague Convention & ICARA*

The Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, S. Treaty Doc. No. 99-11, reprinted in 51 Fed. Reg. 10,494 (Mar. 26, 1986) directs courts of contracting states to order the return of a child wrongfully removed from or retained outside of the child's country of habitual residence. *See Golan v. Saada*, 596 U.S. 666, 669 (2022).[3] The United States and Colombia are each contracting parties to the Convention. *Saavedra v. Montoya*, No. 21-cv-05418, 2023 WL 2910654, at *13 n.26 (E.D.N.Y. Apr. 12, 2023), *appeal withdrawn*, No. 23-cv-00694, 2023 WL 5600054 (2d Cir. Aug. 4, 2023). Congress implemented the Convention in the United States through ICARA. The Convention's "core premise is that the interests of

---

[3]    Throughout this Order, the Court omits all internal quotation marks, footnotes, and citations, and adopts all alterations, unless otherwise indicated.

children in matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence." *Golan*, 596 U.S. at 670. Accordingly, "return is merely a provisional remedy that fixes the forum for custody proceedings." *Id.* at 671.

The party petitioning for relief pursuant to the Convention has the initial burden to show by a preponderance of the evidence that the child was wrongfully removed or retained. *Id.* This requires three elements: "(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention." *Royal Borough of Kensington & Chelsea v. Bafna-Louis*, No. 23-cv-00470, 2023 WL 6867135, at *1 (2d Cir. Oct. 18, 2023) (citing *Gitter v. Gitter*, 396 F.3d 124, 130–31 (2d Cir. 2005)). The petitioner must establish each element by a preponderance of the evidence. 22 U.S.C. § 9003(e)(1)(A).

The first element, habitual residence, is not defined in the Convention. *Monasky v. Taglieri*, 589 U.S. 68, 76–77 (2020). Rather, a child's habitual residence is where he or she is "at home." *Id.* at 77. As the Supreme Court explained in *Monasky*, this determination "depends on the totality of the circumstances specific to the case." *Id.* at 71. Accordingly, courts must remain "sensitive to the unique circumstances of the case and informed by common sense." *Id.* at 77–78, 84. A child's habitual residence may turn on a variety of facts, none of which will be dispositive in every case. *Id.* at 78. These include "where a child has lived, the length of time there, acclimatization, and the purposes and intentions of the parents." *Grano v. Martin*, 821 F. App'x 26, 27 (2d Cir. 2020) (summary order). By approaching the habitual residence determination with "maximum flexibility,"

9

courts can stay faithful to the "core premise" of the Convention to ensure that custody determinations are made in the child's home country. *Monasky*, 589 U.S. at 72, 79.

Because where a child is "at home" can change due to, for instance, changes in geography and the parents' intentions, it is therefore possible for a child to acquire a new habitual residence. *See Taveras v. Morales*, 22 F. Supp. 3d 219, 230 (S.D.N.Y. 2014) ("[A] child acquires a new habitual residence if the parents formed a settled intention to abandon the one left behind."); *Gitter*, 396 F.3d at 133 ("[A] change in geography is a necessary condition to a child acquiring a new habitual residence."). Where the intent "of those entitled to fix the child's habitual residence" diverges, a child's habitual residence can be altered where "the evidence points unequivocally to the conclusion that the child has become acclimatized to his new surroundings and that his habitual residence has consequently shifted." *Gitter*, 396 F.3d at 133. However, courts will find that a child has acquired a new habitual residence only in "relatively rare circumstances." *Hofmann v. Sender*, 716 F.3d 282, 294 (2d Cir. 2013); *see also Abouelmagd v. Semeniuk*, No. 25-cv-04402, 2025 WL 3042413, at *10 (E.D.N.Y. Oct. 31, 2025) ("In rare circumstances, a child may acclimatize to new surroundings such that their habitual residence has shifted."). That is, in those circumstances in which "a child's degree of acclimatization is so complete that serious harm can be expected to result from compelling his or her return to the family's intended residence." *Abouelmagd*, 2025 WL 3042413, at *10. Put differently, a child's habitual residence will be deemed to have shifted where "[r]equiring return to the original country would . . . be tantamount to taking the child out of the family and social environment in which its life has developed." *Id.* (quoting *Gitter*, 396 F.3d at 134).

### B. Colombian Contract & Custody Law

The parties executed their divorce agreement while they resided in Colombia, where petitioner still resides, and the agreement was ratified by a judgment entered by a Colombian Court. Therefore, Colombian law governs the Divorce Decree. *See A.A.M. v. J.L.R.C.*, 840 F. Supp. 2d 624, 634 (E.D.N.Y. 2012), *aff'd sub nom. Mota v. Castillo*, 692 F.3d 108 (2d Cir. 2012) (concluding that Mexican contract law applied to suit under Convention in part because Mexico "has a strong interest in protecting its citizens' justifiable expectations" and "[a]ny interest of New York . . . is ephemeral and transient"); *see also TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 939 (D.C. Cir. 2007) (explaining that lower court "correctly observed that th[e] matter is a peculiarly Colombian affair, concerning . . . a dispute involving Colombian parties over a contract to perform services in Colombia which led to a Colombian arbitration decision and Colombian litigation," and, therefore, "the parties also agreed to be bound by Colombian law"). Accordingly, the Court takes judicial notice of the following principles of Colombian law.[4]

Pursuant to Colombian law, "intent prevails over the literal meaning of the words," and "[t]he clauses of a contract are to be interpreted . . . with the others, giving to each the meaning that is more in accordance with the entire contract." Civil Code of Colombia ("Civ. Code Col."), Arts. 1618, 1622 (Julio Romanach, Jr., trans.) (2022). Moreover, under

---

[4]    Although, as set out below, the parties provided expert testimony and translations as to certain parts of Colombian law, the Court relies on, where appropriate, the Romanach translation as the source of the Civil Code of Colombia in English. *See also Tatari v. Durust*, 25-253-cv, 2025 WL 947009, at *1 (2d Cir. Mar. 28, 2025) ("*Tatatari III*") (summary order) ("In determining foreign law, the court may consider any relevant material or source . . . whether or not submitted by a party or admissible under the Federal Rules of Evidence."); *see also Restrepo I*, 2025 WL 939294, at *7 n.8.

Colombian law, "[a] meaning according to which a clause can produce some effect is to be preferred to one that would render it incapable of producing effects." Civ. Code Col. Title XIII, Arts. 1620.

In addition, both parties presented testimony as to the content of Colombian law, including its applicability to the parties' custody rights and interpretation of the various Colombian court orders. Petitioner presented testimony from his expert witness, Mariana Garcia Jimeno; respondent presented testimony from her lawyer who represented her in the Colombian family court proceedings, Sandra Maria Alzate Molina.

### i. Mariana Garcia Jimeno

Ms. Jimeno is a Colombian lawyer qualified as an expert in Colombian custody law. Tr. 110:5–13. Ms. Jimeno has been licensed to practice Colombian law since 2016 and has taught family law as an adjunct professor at the Universidad de los Andes in Bogotá, Colombia, since 2018. Tr. 98:1–13. Ms. Jimeno worked for Colombia's Central Authority for Hague Convention cases from October 2019 to April 2021, and specifically handled hundreds of abduction cases during her tenure. Tr. 99:14–100:6. She has previously provided expert testimony on Colombian custody law for courts in Brazil, Australia, Germany, and in the United States. Tr. 100:7–14; *see also* PX37.

Ms. Jimeno prepared an expert report in connection with these proceedings. *See* Tr. 110:18–24. Ms. Jimeno testified about her expert opinions at the Hearing. She testified that there are two sets of rights parents have regarding their underage children under Colombian law: (1) parental authority or "*patria potestad*" (sometimes called *patria potestas*) rights, which derive from Article 288 of the Colombian Civil Code and refer to the set of rights parents have in order to discharge their obligations as parents, i.e., "the ability to make decisions regarding the child's life," Tr. 116:5–15, 117:5–16; and (2)

physical guardianship and custody rights derived from Article 23 of the Colombian Childhood Adolescence Code, i.e., "the personal and direct care of the child," Tr. 116:16–23. Ms. Jimeno explained that the two sets of rights are distinct concepts, and that physical custody does not include the authority to make life decisions for the child. Tr. 116:24–117:1. She further explained that *patria potestad* confers the right to decide "every aspect of the [child's] life," including where they attend school, medical decisions, and where the child lives—"except [not] the specific address where the child lives." Tr. 118:9–13. She testified that *patria potestad* is granted equally to both parents pursuant to Article 288 of the Colombian Civil Code, and that *patria potestad* can be suspended or terminated only by judicial decision of family court. Tr. 118:18–21, 119:16–120:3.

Based on her review of documents in the record and her knowledge of Colombian law, Ms. Jimeno testified that respondent's right to physical custody of L.C. referred only to the "personal and direct care" of L.C., "not the capacity to establish [L.C.'s] domicile[.]" Tr. 120:15–19. She testified that the Divorce Decree "explicitly exerted" that if respondent wished to move L.C. outside of Itagüí or Medellín, "she should have gone before a family court" to seek permission. Tr. 121:5–10. Ms. Jimeno explained that where, as here, both parents hold *patria potestad* rights and there is a disagreement concerning where the child lives, Colombian law provides for a specific proceeding in which a family judge would resolve such differences. Tr. 121:14–122:16. Ms. Jimeno testified that, based on her knowledge, respondent did not avail herself of such a proceeding, or otherwise receive permission through a Colombian court or administrative body to relocate L.C. Tr. 123:2–7. Accordingly, Ms. Jimeno opined that respondent did not have a right under Colombian

13

law to relocate L.C. to New York without petitioner's consent, and in doing so, breached petitioner's custody and *patria potestad* rights. *See* Tr. 131:22–132:6, 135:14–136:1.

### ii. Sandra Maria Alzate Molina

Ms. Molina is an attorney who has been practicing family law in Colombia since 2004. Tr. 187:23–188:1. She represented respondent in various Colombian proceedings including her divorce proceedings and post-divorce proceedings involving L.C. Tr. 188:10–15. Ms. Molina testified that the Divorce Decree did not indicate that petitioner could control where L.C. lives. Tr. 189:24–190:1. She opined that petitioner did not have the right to determine L.C.'s residence because, in her view, the Divorce Decree conferred custody to respondent. Tr. 193:15–19. Ms. Molina also testified about Article 110 of the Code of Childhood Adolescence—which requires a child leaving Colombia with only one parent to "obtain the permission" of the non-travelling parent. *See Saavedra v. Montoya*, No. 21-cv-05418, 2023 WL 2910654, at *5 n.10 (E.D.N.Y. Apr. 12, 2013) ("Article 110 of Colombia's Code on Parental Authority, Custody Rights and Alimony requires a child leaving Colombia with only one parent to formally obtain the permission of the non-traveling parent."). She testified that an exception to Article 110 provides that a child may leave the country without permission from a non-travelling parent if two requirements are met: (1) the travelling parent has a certificate of residence from the Colombian Consulate; and (2) the parent has a legal document stating "that the person leaving the country with the child holds . . . custody and personal care[.]" Tr. 195:25–196:7. And according to Ms. Molina, respondent satisfied both requirements before relocating L.C. *See* Tr. 196:8–12.

14

## II.    Conclusions of Law

Respondent challenges petitioner's prima facie case on two grounds. First, she argues that L.C.'s habitual residence at the time of the alleged wrongful removal was the United States, not Colombia. Second, respondent argues that she was granted full custody of L.C. during the Colombian court proceedings and, accordingly, could unilaterally move L.C. to the United States without abridging petitioner's custody rights. The Court disagrees on both fronts. Specifically, the Court finds that Colombia was the place of L.C.'s habitual residence immediately prior to his removal to the United States on December 3, 2025. Additionally, the Court concludes that petitioner retained custodial rights over L.C. even after the Colombian court proceedings, and that respondent violated those rights by attempting to permanently move L.C. out of Colombia without petitioner's consent. Accordingly, L.C. was wrongfully removed to the United States on December 3, 2025, in violation of the Convention and must be returned to Colombia.

### A.  Habitual Residence

Petitioner has met his burden to show by a preponderance of the evidence that L.C.'s place of habitual residence at the time of his alleged wrongful removal was Colombia. As a threshold matter, the Court incorporates by reference its prior habitual residence analysis and conclusion in *Restrepo I* that "Colombia was the place of L.C.'s habitual residence immediately prior to his wrongful retention in the United States on May 16, 2024[.]" *Restrepo I,* 2025 WL 939294, at \*8.[5] Thus, consistent with ICARA's requirement "that Hague Convention determinations be given full faith and credit," *White*

---

[5]    Respondent is challenging this determination in her pending Second Circuit appeal. *See* App. Br. 7, *Escobar Restrepo v. Correa Morales*, No. 25-806 (2d Cir. Oct. 20, 2025), Dkt. No. 40.1 ("The district court erred in finding that L.C.'s habitual residence was Colombia at the time of the alleged wrongful retention on May 16, 2024[.]").

*v. White*, No. 12-cv-00200, 2012 WL 3041660, at *17 (S.D.N.Y. July 20, 2012), *report and recommendation adopted*, 2013 WL 1340145 (Mar. 28, 2013), *aff'd*, 556 F. App'x 10 (2d Cir. 2014) (summary order), the habitual residence inquiry here is framed as whether L.C.'s habitual residence shifted from Colombia on May 16, 2024—as was previously determined in *Restrepo I*—to the United States by the time of L.C.'s alleged wrongful removal in this action on December 3, 2025, *see* 22 U.S.C. § 9003(g) ("Full faith and credit shall be accorded by . . . the courts of the United States to the judgment of any other such court ordering or denying the return of a child, pursuant to the Convention[.]"); *see also Boehm v. Boehm*, No. 10-cv-01986, 2011 WL 863066, at *1 (M.D. Fla. Mar. 10, 2011) ("[T]he court concludes that [the] [p]etitioner is barred under principles of comity and issue preclusion from re-litigating the child's habitual residence because she previously, and unsuccessfully, sought identical relief" in separate Hague Convention proceedings.); *Pliego v. Hayes*, No. 15-cv-00146, 2015 WL 4464173, at *7 (W.D. Ky. July 21, 2015) ("In [the first Convention proceeding] this Court determined that the child's country of habitual residence was Turkey. . . . [N]either the child's return to Turkey, nor [respondent] returning the child to the United States, alter that determination. Turkey remains the child's habitual residence."), *aff'd*, 843 F.3d 226 (6th Cir. 2016).

The Court finds that L.C.'s habitual residence did not shift. From the time L.C. was returned to Colombia on April 18, 2025, and when he was removed to the United States on December 3, 2025, he lived exclusively in Medellín, Colombia. Tr. 41:11–13. He was enrolled in a Colombian school for four months, and participated in various sports and activities such as boxing, horseback riding, and tennis. Tr. 54:16–55:15, 57:10–19; *see also* PX2. L.C. received medical care in Colombia and remained on petitioner's Colombian health insurance. Tr. 46:10–47:17. L.C. had weekly playdates with friends, Tr. 58:14–22,

16

and visited with both maternal and paternal family members in Colombia, *see* Tr. 45:12–46:9. In short, the evidence does not "unequivocally point[] to the conclusion" that L.C. was no longer a habitual resident of Colombia and acquired a new habitual residence at the time of his removal. *Gitter*, 396 F.3d at 134; *see also Lachhman v. Lachhman*, No. 08-cv-04363, 2008 WL 5054198, at *6 (E.D.N.Y. Nov. 21, 2008) (reasoning that the evidence did not "unequivocally point[] to the conclusion that the child ha[d] acclimatized to her new location in the United States," where, "[a]t most, the child ha[d] spent the better part of two years in the United States since her removal" but the child kept in contact with the petitioner, "moved to several different locations in the United States at various times, and ha[d] on occasion left the United States with [the] respondent").

Respondent attempts to resist this conclusion by arguing that the totality of the circumstances test articulated in *Monasky* demands that the Court place significant weight on the amount of time L.C. spent in the United States between May 2024—when L.C. was previously found to be wrongfully retained in the United States—and April 2025, when L.C. was returned to Colombia pursuant to the Court's previous Order of Return. Tr. 11:16–21. Specifically, one of L.C.'s teachers at his New York pre-school testified that L.C. was one of her students from September 2024 through April 2025. *See* Tr. 168:9–18. She testified that L.C. cooperated well with his classmates, had many friends at school, contributed to the classroom, and spoke "proper[] and appropriate[]" English. Tr. 168:23–169:8, 169:10–13, 169:24–170:2, 171:23–172:5.

In respondent's view, New York is L.C.'s habitual residence by "she[e]r numbers." Tr. 299:7–8. That is, L.C. "was physically in New York from May 16, 2024 until April 18, 2025 for a total of 11 months and two days," but was in Colombia only for "a total of 7 months and 15 days." Tr. 299:3–8. And according to respondent, this difference in time

17

spent in the respective countries in tandem with L.C.'s schooling, friends, and activities in New York, demonstrates that his habitual residence at the time of December 3, 2025, had shifted to the United States. *See* Tr. 301:17–302:19. Indeed, respondent suggests that petitioner's testimony concerning L.C.'s schooling, activities, and life in Colombia do not sufficiently support the conclusion that L.C. had acclimatized to Colombia upon his return. *See* Tr. 83:15–86:7. The Court is unconvinced.

For one, respondent supplies no authority[6]—and the Court is unable to find any— for the proposition that evidence of a child's life after a wrongful removal or retention can be used to support a habitual residence determination. In fact, the greater weight of authority suggests the opposite. *See Diorinou v. Mezitis*, 237 F.3d 133, 142 (2d Cir. 2001) (acknowledging district court's observation that "a parent cannot create a new habitual residence by the wrongful removal and sequestering of a child"); *Blackledge v. Blackledge*, 866 F.3d 169, 187 (3d Cir. 2017) (noting that "the [d]istrict [c]ourt mistakenly

---

[6]     The Court provided respondent an opportunity to provide such authority, *see* Tr. 61:8–15, but none of her cited cases support the precise view she advances here: evidence of a child's life after their wrongful removal or retention—as determined by a Court in a separate Convention proceeding—but before the child is returned to their home country bears on a subsequent habitual residence analysis. For instance, during the Hearing respondent cited to *Sanchez-Londono v. Gonzales*, 752 F.3d 533 (1st Cir. 2014) as authority suggesting that the court there considered that the child acclimatized to the United States after being wrongfully removed from Colombia. *See* Tr. 11:9–16. However, the First Circuit there affirmed the district court's conclusion that "no wrongful retention occurred" in the first place. *Sanchez-Londono*, 752 F.3d at 543. Similarly, respondent argues that in *Reid v. Remekie*, No. 25-cv-00904, 2025 WL 1769364, at *9 (E.D.N.Y. June 26, 2025), "the court found that a child had acclimatized to Jamaica because the child became settled in Jamica and fully integrated into Jamaican life." Resp't's Br. Regarding Admissibility of Evidence 3, ECF No. 65. But that court's acclimatization analysis and conclusion "that the children's habitual residence had changed," relied on evidence predating the alleged wrongful date of removal. *See Reid*, 2025 WL 1769364, at *13 (considering "compelling evidence that the children ha[d] acclimated," including the time that the children spent in Jamaica "[a]s of the date of removal," and concluding that "as of [the removal date], the children became settled in Jamaica and fully integrated into Jamaican life").

considered post-retention-date evidence" when determining whether the child acclimatized to new habitual residence); *see also Panteleris v. Panteleris*, 30 F. Supp. 3d 674, 684 (N.D. Ohio 2014) ("The [c]ourt cannot accept evidence of schooling and therapy that occurred after [the time of the alleged wrongful retention] to establish habitual residence."), *aff'd*, 601 F. App'x 345 (6th Cir. 2015). Indeed, "[c]ourts are not entirely in agreement regarding whether the time a child spends in another country should be considered in determining acclimatization when one parent *alleges* the child's retention in or removal to that country is wrongful," *Mohácsi v. Rippa*, 346 F. Supp. 3d 295, 313 (E.D.N.Y. 2018) (emphasis added), much less when a court has already *determined* in a previous Convention proceeding that the retention was in fact wrongful.

This view accords with the "Second Circuit's articulated principle that it would frustrate the objectives of the Convention if a parent or guardian could secure an advantage in an anticipated custody dispute by merely retaining a child long enough to amass evidence of the child's acclimatization to a new location." *Ochoa v. Perez*, No. 24-cv-04736, 2025 WL 1031340, at *3 (S.D.N.Y. Apr. 7, 2025) (quoting *Mota v. Castillo*, 692 F.3d 108, 116 (2d Cir. 2012)). Accordingly, courts have reasoned that "it would be inappropriate to consider the period of time *after* the alleged wrongful removal in the acclimatization analysis, as this could reward the allegedly abducting parent for the time during which the child was allegedly wrongfully retained or removed." *Ordonez v. Tacuri*, No. 09-cv-01571, 2009 WL 2928903, at *6 n.8 (E.D.N.Y. Sep. 10, 2009) (emphasis in original); *accord Garcia v. Pinelo*, 808 F.3d 1158, 1169 (7th Cir. 2015) (endorsing district court's conclusion, where the child "unequivocally objected to being returned" for the first time thirteen months after he was wrongfully retained, that "refusing to return [the child] under such conditions would reward [the respondent] for the continued wrongful

19

retention[,] [and] would also signal that a parent might escape the Convention by running out the clock until the wrongfully retained child became accustomed to her new home"). The Court finds this reasoning persuasive here and therefore "accords little weight" to evidence of L.C.'s acclimatization to the United States between his previously determined wrongful retention in the United States on May 16, 2024 and his return to Colombia, "as doing [more] would reward [r]espondent for . . . wrongful behavior." *Abouelmagd*, 2025 WL 3042413, at *11.

Nothing in the Supreme Court's decision in *Monasky* undermines this conclusion. The *Monasky* Court clarified that "a child's habitual residence depends on the totality of the circumstances specific to the case." 589 U.S. at 71.[7] To be sure, nowhere in *Monasky* did the Supreme Court announce a bright-line rule that courts cannot consider post-abduction evidence in making a habitual residence determination. But that is unsurprising given *Monasky's* reaffirmance of the "common understanding" that a child's habitual residence is "[t]he place where a child is at home, *at the time of removal or retention.*" *Id.* at 77 (emphasis added). It makes sense then that *Monasky* did not address post-retention evidence given its recognition that habitual residence determinations concern evidence of a child's life prior to or "at the time of removal or retention." *Id.* Put

---

[7]    Moreover, as this Court explained in *Restrepo I*, "the *Monasky* Court was concerned with a specific circumstance: where an infant's parents have never come to an agreement as to where he or she will be raised, a requirement that the parties come to such an agreement would mean that these children would *never* have an established habitual residence." *Restrepo I*, 2025 WL 939294, at *6 n.7 (emphasis in original). That is, of course, "materially different" from cases such as the instant suit, "in which the question before the Court is whether the child's habitual residence has *changed* from one country to another." *Id.* (emphasis in original); *see also Reid*, 2025 WL 1769364, at *9 (explaining that "after *Monasky* the shared intent of the parents is no longer the primary factor to determine habitual residence," but nevertheless "the questions from pre-*Monasky* cases assessing shared parent intent are still useful guidelines").

differently, *Monasky* did not disturb the general principle that courts "look back in time from the period of wrongful retention, not forward."[8] *Panteleris*, 601 F. App'x at 349; *see also In re Kim*, 404 F. Supp. 2d 495, 512 (S.D.N.Y. 2005) ("Although habitual residence is not defined in the Convention, the text of the Convention directs courts to the time immediately before the removal or retention.").

In sum, in light of the specific circumstances of the case and considering the totality of the circumstances, the Court finds that petitioner has shown by a preponderance of the evidence that L.C.'s place of habitual residence was Colombia as of December 3, 2025. *See Monasky*, 589 U.S. at 78. Specifically, as the Court previously concluded, the parties "last shared an intent for L.C.'s habitual residence to be Colombia," and L.C. "did not experience acclimatization to such an extent that his habitual residence changed from Colombia to the United States." *Restrepo I,* 2025 WL 939294, at *10. The facts and evidence concerning L.C.'s acclimatization to life in the United States following the wrongful retention and before his return to Colombia are afforded no more than marginal weight, as placing undue weight on this evidence would "reward [respondent] for the time during which [L.C.] was . . . wrongfully retained." *Ordonez*, 2009 WL 2928903, at *6 n.8; *see also Wtulich v. Filipkowska*, No. 16-cv-02941, 2019 WL 1274694, at *5 (E.D.N.Y. Mar. 20, 2019) ("While considering evidence of acclimatization makes sense where it occurred during a period of shared parental intent about a child's

---

8       The Court notes that the unique issue presented here, of course, is that "look[ing] back in time" from the date of the alleged wrongful removal in this action—December 3, 2025—includes a period of time after the date of the wrongful retention in *Restrepo I*, May 16, 2024. For the avoidance of doubt, the Court does not entirely disregard evidence of L.C.'s life from this period in its habitual residence determination. Rather, for the reasons explained in this Order, the Court finds that such evidence warrants no more than marginal weight in determining L.C.'s habitual residence.

residence, doing so where the acclimatization occurs only as a result of one parent's unilateral decision frustrates the Convention's purpose."). And the evidence shows that L.C. was residing in Colombia for the seven months immediately preceding his removal, and that he was involved in social activities, school, and had friends and family in Colombia. *See* Tr. 45:12–46:9, 54:16–55:15, 57:10–19, 58:14–22. The Court thus cannot conclude that requiring L.C. to return to Colombia "would now be tantamount to taking [L.C.] out of the family and social environment in which [his] life has developed." *Gitter*, 396 F.3d at 134.[9] Accordingly, the Court concludes that L.C.'s habitual residence has not shifted and remained Colombia at the time of his removal.

---

[9]       To the extent respondent urges that the habitual residence analysis be made "from the child's perspective," Tr. 243:14–15, and that the Convention's "central goal [is] the best interest of the child[,]" Tr. 297:4–5, the Court reiterates that the Convention does not "task the Court with resolving this custody dispute based on the best interests of the child—those are arguments and questions for another court." *Restrepo I*, 2025 WL 939294, at *14 (citing *Monasky*, 589 U.S. at 82); *see also Baz v. Patterson*, 100 F.4th 854, 871 (7th Cir. 2024) ("The Convention seeks to promote the best interests of the child by entrusting custody proceedings to the country where the child is at home."). Thus, the Court's inquiry is not simply L.C.'s best interest, rather, the relevant inquiry is where L.C. is at home so that that forum can adjudicate custody in the best interests of L.C. And in any event, it does not follow that determining L.C.'s habitual residence from his perspective requires the Court to give significant weight to evidence of his life after a wrongful retention or removal, particularly given the fact that the Convention contemplates specific circumstances—inapplicable to this case—where such consideration is appropriate and related to the child's best interests, including Article 12's well-settled defense and Article 13's grave risk of harm defense. *See Tomalski v. Tomalski*, No. 16-cv-01808, 2017 WL 11918005, at *5 (E.D.N.Y. Apr. 27, 2017) ("After a year has passed, the court can consider a respondent's now settled defense—that, despite the wrongful removal, the children should not be returned because they are now settled in their new environment."); *see also Blondin v. DuBois*, 238 F.3d 153, 164 (2d Cir. 2001) ("None of this implies that the question of whether a child is settled may not be considered *at all* under Article 13(b). . . . Under Article 13(b), the fact that a child is settled may form part of a broader analysis of whether repatriation will create a grave risk of harm.") (emphasis in original).

### B. Custody Rights

Having found that L.C.'s habitual residence immediately prior to the alleged wrongful removal on December 3, 2025, was Colombia, the Court must assess whether petitioner has established the second element of a prima facie case under the Convention: whether L.C.'s removal breached petitioner's custody rights under Colombian law. A "right of custody" under the Convention "include[s] rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Poix v. Susibel Altagracia Espaillat Santana*, No. 22-cv-04980, 2022 WL 9847347, at *7 (S.D.N.Y. Oct. 17, 2022). However, "even minimal parental rights to determine a child's place of residence may qualify as rights of custody under the Convention." *Id.*; *see also Ozaltin v. Ozaltin*, 708 F.3d 355, 367 (2d Cir. 2013) ("As the Supreme Court has explained, the Convention's broad definition of rights of custody is not constrained to traditional notions of physical custody. Instead, the Convention recognizes the increasingly common exercise of joint legal custody, in which one parent cares for the child while the other has joint decisionmaking authority concerning the child's welfare."). Pursuant to the Convention, "rights of custody" emerge from "three possible sources": "(1) judicial or administrative decisions; (2) legally binding agreements between the parties; and (3) an operation of the law of the state of the child's habitual residence." *Radu v. Toader*, 805 F. Supp. 2d 1, 8 (E.D.N.Y. 2011); *see also Ozaltin*, 708 F.3d at 367 ("The *substance* of . . . custody rights . . . is provided by the domestic law of the State in which the child was habitually resident immediately before the removal, or by reason of a

23

judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.").

The parties largely agree that the Divorce Decree allocated certain custody rights over L.C., and that the Decree granted respondent "physical custody" of L.C. *See* PX18. Where they diverge is the proper interpretation and scope of respondent's physical custody of L.C. Specifically, petitioner presented evidence that (1) the Decree's conferral of physical custody over L.C. to respondent was conditioned on her and L.C. continuing to live in Colombia, *see* Tr. 31:3–7; and (2) even if there was no geographical limit, the Decree's conferral of physical custody conferred only that, physical custody, i.e., conferral of physical custody did not simultaneously confer the right to unilaterally "make life decisions for the child," including the right to change L.C.'s country of residence, *see* Tr. 116:24–117:1, 120:9–19. For the reasons that follow, the Court agrees, and thereby finds that petitioner has proven by a preponderance of the evidence that L.C.'s removal to the United States violated his rights of custody under Colombian law and the Convention.

### i. Divorce Decree

The Divorce Decree indicates that the parties agreed to terminate their marriage and "settle matters relating to their child." PX18. The first provision of the Decree reads as follows:

> PHYSICAL CUSTODY: The child will continue to live with his mother in the Medellín metropolitan area, in a place that Sebastían declares to be known to him, with JULIANA being requested to inform the father of any change in the child's residence.

PX18.

The Decree also sets out petitioner's child support obligations, and outlines petitioner's visitation schedule with L.C. *See* PX18. The Decree states that by entering into

24

the agreement respondent did "not imply a waiver of the right to go before the administrative and/or ordinary courts to request a residence permit in another country for her son[.]" PX18. Finally, the Decree ordered the parties to "meet with the court social worker to establish guidelines for parenting and education, prohibitions and permissions for the child, [and] methods of correction and punishment[.]" PX18.

The parties presented competing testimony as to the proper interpretation of the Divorce Decree. Petitioner's expert witness opined that the part of the Decree conferring respondent physical custody was conditioned on her remaining within Medellín. *See* Tr. 129:23–130:1. In other words, the Decree did not confer the ability to relocate L.C. out of the country because the Decree "is very clear that the mother has custody of the child in Medellín and its metropolitan area." Tr. 130:5–7. Respondent presented testimony from Ms. Molina, her attorney in Colombian court proceedings, that the Decree simply states that L.C. would "continue residing with his mom" and that she must "inform [the father] of any change in residence." Tr. 192:4–8. But, according to Ms. Molina, "nowhere in the document does it say that she has to ask for his permission" to change L.C.'s residence. Tr. 192:8–10.

The Court finds by a preponderance of the evidence that petitioner's interpretation is correct. Regardless of how respondent attempts to parse the custody provision, the Decree unambiguously states that L.C. "will continue to live with his mother in the Medellín metropolitan area, in a place that [petitioner] declares to be known to him." PX18. Moreover, consistent with principles of Colombian law, "intent prevails over the literal meaning of the words," and "[t]he clauses of a contract are to be interpreted . . . with the others, giving to each the meaning that is more in accordance with the entire contract." Civ. Code Col. Title XIII, Arts. 1618, 1622. Here, the remainder of the Decree

reflects that the parties contemplated respondent's physical custody of L.C. was conditioned upon residing in the Medellín area. The Decree sets forth a visitation schedule by which L.C. would stay with petitioner overnight every other weekend. PX18. Petitioner was further granted weekly access to the child, "on Tuesdays and Wednesdays of the week that the child is not spending with him." PX18. And petitioner's child support was to be deposited into a Colombian bank account. PX18. What's more, Colombian law provides that "[a] meaning according to which a clause can produce some effect is to be preferred to one that would render it incapable of producing effects." Civ. Code Col. Title XIII, Art. 1620. If, as respondent contends, the Decree gave her full authority to move L.C. outside of Colombia without petitioner's consent, then the Decree's provision stating that respondent did not "waiv[e] . . . the right to go before the administrative and/or ordinary courts to request a residence permit in another country for her son," PX18, would essentially be of no effect, *see* Tr. 294:15–22.

Other evidence in the record underscores the parties' understanding that the Divorce Decree codified that respondent's custody of L.C. was conditioned upon remaining in Medellín, or, at minimum, that it did not confer the right to move L.C. permanently out of the country. Two weeks after the Decree was entered, respondent commenced conciliation proceedings "for the purpose of agreeing to permission to leave the country for the purpose of settling/establishing residence of . . . [L.C.] in the United States with his mother." PX20; *see* Tr. 266:5–15. Specifically, respondent sought, among other things, (1) permission for L.C. to leave the country to take up residence in the United States; (2) revision of the visitation schedule to be "adapted to the new residence abroad"; and (3) "revision of custody and personal care, to remain exclusively with the mother in the new country of residence." PX20; *see* Tr. 266:5–15. Petitioner testified that this

proceeding emerged because the Decree "had a rule that [respondent] should live with L.C. within the [Medellín] metropolitan area." Tr. 40:12–13.[10] The Court finds that this testimony, along with the text of the Divorce Decree, petitioner's expert testimony, and other documentation in the record, supports the conclusion that the parties intended that the custody arrangement was predicated upon L.C. remaining in Colombia, and that respondent's physical custody of L.C. was conditioned upon doing so.

For this reason, respondent's argument that interpretation of the Divorce Decree "comes down to a she said/she said, petitioner's expert witness versus mother's lawyer," is unavailing. Tr. 306:6–12. Petitioner's interpretation is not only supported by his expert witness, but also by evidence in the record demonstrating that the relief respondent sought following the Divorce Decree was consistent with the limitations petitioner testified that the Decree imposed. *See N.Y. Marine & Gen. Ins. v. Lararge N. Am., Inc.*, 599 F.3d 102, 119 (2d Cir. 2010) ("There is no surer way to find out the intent of the parties to a contract than to see what they have done.").

Indeed, respondent's lawyer's testimony about the meaning of the Divorce Decree was not compelling. When asked what the Divorce Decree said about L.C.'s residence, Ms. Molina testified that the document states that "the child will continue residing with his mom and all she has to do is inform [the father] if there is any change in residence."

---

[10]    On cross-examination, respondent attacked petitioner's credibility by impeaching his testimony and eliciting evidence that he has lied to a Colombian court and misrepresented facts in tax documents. *See* Tr. 70:13–71:15, 73:5–74:7. And during her closing, respondent again raised petitioner's alleged propensity to "lie[] and attempt[] to craft his case to L.C.'s detriment." Tr. 301:17–18. To be sure, respondent has presented evidence demonstrating that petitioner is not entirely credible. Still, for the reasons set forth above and below, the Court does not rely wholly on petitioner's testimony in interpreting the meaning and force of the Divorce Decree and concluding that a preponderance of the evidence supports petitioner's interpretation.

Tr. 192:4–8. In other words, the Medellín clause was not a limitation on respondent's custody, but simply a description of where L.C. and respondent resided at that time. *See* Tr. 246:20–22, 306:13–23. But no other evidence elicited at the Hearing or in the record supports the view that the Medellín clause was simply meant to describe the then-existing state of affairs. In fact, a preponderance of the evidence indicates that the provision was negotiated and agreed upon in light of petitioner's consistent refusal to permit L.C. to reside in the United States. *See, e.g.*, Tr. 30:14–16 ("Due to her initiative of living abroad, I requested that there be a geographic limitation to the physical custody."). In a similar vein, respondent's argument that the Divorce Decree's provision codifying her right to seek relocation in another court was simply a belt-and-suspenders approach to preserving her already-existing right to leave the country with L.C. is refuted by the parties' negotiations during the divorce proceedings, and respondent's conduct following entry of the Divorce Decree. *See* Tr: 29:5–31:7, 266:5–22.

Accordingly, the Court concludes that petitioner has proven by a preponderance of the evidence that respondent's physical custody of L.C. was conditioned on remaining in Colombia and, by removing L.C. from Colombia and seeking to reside elsewhere, respondent breached petitioner's rights of custody. *See Laguna v. Avila*, No. 07-cv-05136, 2008 WL 1986253, at *6 (E.D.N.Y. May 7, 2008) ("[C]ritically, given [the petitioner's] right under the [c]ustody [a]greement to have [the child] returned to Colombia . . . . there is no dispute that [the respondent] breached [the petitioner's] custody rights by her unilateral decision to retain [the child] in the United States following the date it was previously agreed he would return to Colombia."); *accord Ostos v. Vegas*, No. 14-cv-03935, 2015 WL 3622693, at *21 (N.D. Tx. June 10, 2015) ("The [d]ivorce [d]ecree sets forth the terms of the parties' custody agreement and the parameters for

each party's rights of possession with respect to [the child]. [The] [r]espondent's decision to retain possession of [the child] beyond the time allowed by the custody agreement . . . and his removal of [the child] to the United States without [the] [p]etitioner's consent or knowledge and refusal to return him . . . were clear violations of the [d]ivorce [d]ecree, custody agreement's visitation provisions, and [the] [p]etitioner's right to designate [the child's] residence. [The] [r]espondent's removal and retention of [the child] were therefore wrongful.").

### ii. Operation of Colombian Law

Separate from the Divorce Decree's conferral of certain custodial rights, petitioner has also met his burden of showing that his rights of custody were breached because the evidence shows that he retained custodial rights by way of Colombian law even following the Divorce Decree. In addition to "rights of custody" arising from mutual agreement or judicial decision, custodial rights "may arise by operation of law[.]" *Royal Borough*, 2023 WL 6867135, at *2. And here, by operation of Colombian law, petitioner held *patria potestad* rights recognized by the Convention both before and after the Divorce Decree was entered. *See Aguirre v. Calle*, No. 08-cv-02613, 2008 WL 4461931, at *5 (E.D.N.Y. Oct. 3, 2008) (explaining that *patria potestad* rights arise under operation of Colombian law and that such rights are "right[s] of custody under the Hague Convention").

As explained in Ms. Jimeno's testimony, under Colombian law, *patria potestad* "is the set of rights that the law grants to the parents of an underage child to be able to fulfill their duties as parents." Tr. 111:3–6. And as set forth in Articles 253 and 288 of the Colombian Civil Code, *patria potestad* captures obligations corresponding to parental authority that gives parents the right to decide, essentially, "[e]very aspect of the [child's] life," such as their "[s]chool, medical decisions, [and] where the child lives." Tr. 118:11–

29

13. Importantly, the right of physical custody is distinguishable from *patria potestad* rights; the former relates to "just the personal and direct care of the child," while the latter pertains to "the rights that every parent has to be able to fulfill their obligations as a parent." Tr. 117:3–9; *see Garcia v. Pinelo*, 125 F. Supp. 3d 794, 804–05 (N.D. Ill. 2015) (explaining that *patria potestad* "is a concept from ancient Roman law" which "survives as a legal doctrine in civil law countries" and that "though *patria potestas* involves the right to decide where a child lives, it is distinct from the right to physical custody") (applying Mexican law); *see also Royal Borough*, 2023 WL 6867135, at *3 ("[T]he Convention's broad definition of rights of custody is not constrained to traditional notions of physical custody.").

The concept of *patria potestad* is well-recognized in Convention proceedings as vesting rights of custody. *See Aguirre*, 2008 WL 4461931, at *5; *see also Mota*, 692 F.3d at 117 (explaining that Mexico's *patria potestas* law of custody placed a series of rights and obligations on holder of parental authority, including "custody of the minors, the authority to raise them, discipline them, represent them in legal acts, administer their property, feed and care for them, as well as the right to ch[o]ose the minor's place of domicile"); *Fuentes-Rangel v. Woodman*, No. 14-cv-00005, 2014 WL 11456066, at *7 (N.D. Ga. May 27, 2014) ("Courts across the United States have uniformly found that *patria potestad* is a right of custody under the Convention.") (applying Mexican law); *accord Garcia*, 808 F.3d at 1164 ("This court has recognized *patria potestas* as a right of custody within the meaning of the Convention") (applying Mexican law). Under Colombian law, *patria potestad* is vested in both parents; divorce does not deprive either parent of *patria potestad*, nor are a parent's *patria potestad* rights deprived if that parent does not have physical custody. *See Tr.* 119:10–120:3; *see also Vale v. Avila*, 538 F.3d 581,

30

587 (7th Cir. 2008) ("When the parent who does not receive physical custody is given the rights and duties of *patria potestas,* he has custody rights within the meaning of the Hague Convention.") (applying Venezuelan law).

Respondent does not dispute that petitioner's *patria potestad* authority remained intact for the entire relevant period. *See* Tr. 271:23–272:1; 303:3–4; *see also* Respt's Proposed FOF & COL ("PFOF & COL") ¶ U, ECF No. 59. Instead, she argues that petitioner's parental authority "does not equate to the right to determine the child's place of residence" under the Convention, and that, because petitioner's consent was not required for respondent to move L.C. to the United States, petitioner fails to "meet his burden to prove that he has rights of custody as rights of custody is defined by the Convention." PFOF & COL ¶ U. Separately, irrespective of petitioner's *patria potestad* rights, respondent argues that her removal of L.C. was lawful pursuant to Article 110 of the Colombian Legislation on Parental Authority and, thus, was not in violation of the Convention. The Court is not persuaded.

### a. *Patria Potestad* Rights

To begin, the operative question is not whether petitioner had the primary ability to determine L.C.'s country of residence, *see* PFOF & COL ¶ U, rather, the question is whether he has proven that a custody right recognized by the Convention was infringed by respondent's unilateral decision to relocate L.C. to the United States, *see Olguin v. Sanatana*, No. 03-cv-06299, 2004 WL 1752444, at *3 (E.D.N.Y. Aug. 5, 2004) ("The violation of a *single* custody right suffices to make removal of a child wrongful. That is, a parent need not have custody of the child to be entitled to return of his child under the Convention; rather, he need only have one right of custody. Further, he need not have a

31

*sole* or even *primary* right of custody." (quoting *Furnes v. Reeves*, 362 F.3d 702, 714–15 (11th Cir. 2004)) (emphasis in original)).

Petitioner has done so here. Specifically, petitioner presented evidence showing that (1) he held *patria potestad* rights under Colombian law, Tr. 132:18–20; (2) such rights are independent from the right of "physical custody," Tr. 116:3–117:4; and (3) the rights and obligations accordant with *patria potestad* includes the right to have a say in the country where L.C. resides, *see* Tr. 118:22–24, 132:3–6; *see also Aguirre*, 2008 WL 4461931, at *5 (explaining that the Colombian Civil Code gives parents "a joint right and responsibility of parental care in the upbringing and education" of a child, and that such *patria potestad* rights are "a right of custody under the Hague Convention"); *Tatari v. Durust*, No. 24-cv-06930, 2025 WL 327984 ("*Tatari II*"), at *9 (E.D.N.Y. Jan. 29, 2025) (recognizing "[p]ersuasive caselaw from other circuits show[ing] that [the] ability to object to [a child's] relocation abroad and present a claim subsequent to that relocation is sufficient to constitute a custodial right," including where "the father had the authority to participate in the decision-making about his child's residence, [and thus] had a right of custody, despite the fact that the mother had the final say" (quoting *Palencia v. Perez*, 921 F.3d 1333, 1339 (11th Cir. 2019))), *aff'd*, No. 25-253-cv, 2025 WL 947009 (2d Cir. Mar. 28, 2025) (summary order).

Even setting aside the right to have a say in where L.C. lived, petitioner has also established that his *patria potestad* rights included rights "relating to the care of the person of [L.C.]" *Tatari v. Durust*, No. 24-cv-6930, 2024 WL 4956307 ("*Tatari I*") (E.D.N.Y. Dec. 3, 2024), at *6 (quoting *Ogawa v. Kyong Kang*, 946 F.3d 1176, 1181 (10th Cir. 2020)). A parent is entitled to return of a child if a single right of custody is violated by the removal. *See Olguin*, 2004 WL 1752444, at *3; *see also Furnes*, 362 F.3d at 714–

32

15. And although "courts have placed particular emphasis on a parent's right to determine the child's place of residence when examining whether a parent has rights of custody, the Convention also states that rights of custody shall include rights relating to the care of the child." *Centeno v. Hernandez*, 757 F. Supp. 3d 1211, 1227 (D. Colo. 2024); *see also Ogawa*, 946 F.3d at 1181 ("Of course, the authority to determine a child's place of residence is not the only type of right that meets the Convention['s] definition for rights of custody. The Convention also provides that rights of custody include rights relating to the care of the person of the child.").

Here, by operation of *patria potestad* under Colombian law, petitioner retained the right to make decisions concerning L.C.'s education and upbringing, how to discipline L.C., as well as maintained the right to administer L.C.'s assets and take legal actions on his behalf. *See* Tr. 117:11–118:13; PX18; PX29. In short, under Colombian law, "parental authority is a right currently vested" in petitioner, PX29, and these rights are custodial and thus protected by the Convention. *See Lachhman*, 2008 WL 5054198, at *6 (explaining that under English law "[p]arental responsibility" includes "all the rights, duties, powers, responsibilities and authority which by law a parent of a child has in relation to the child and his property," and that a "plain reading of the definitions of parental responsibility [under English law] and rights of custody [under the Convention] leads to the conclusion that the former includes the latter"); *Ogawa*, 946 F.3d at 1181 (explaining that "parental authority, under Japanese law, includes . . . a broad collection of . . . rights including, among others, the rights to care for and educate the child, to discipline the child, to handle the child's money, and to take legal actions on behalf of the child," and concluding that "[t]hese rights relate to the care of the person of the child").

And here, petitioner testified that in connection with L.C.'s removal to the United States, respondent removed L.C. from a Colombian school petitioner helped choose for L.C., Tr. 55:5–10; *see* Tr. 56:23–57:5:, did not answer petitioner's phone calls, Tr. 59:4–9, and interfered with petitioner's visitation schedule—visitations which facilitated L.C.'s participation in extracurricular activities, *see* Tr. 59:4–9, 83:15–85:2. Thus, by moving L.C. to the United States without petitioner's knowledge or consent, respondent "effectively precluded [p]etitioner from caring for the [c]hild and making decisions regarding the [c]hild's welfare and upbringing." *Giampaolo v. Erneta*, 390 F. Supp. 2d 1269, 1279 (N.D. Ga. 2004); *see also Rodriguez Palomo v. Howard*, 426 F. Supp. 3d 160, 176 (M.D.N.C. Dec. 6, 2019) ("It would belie common sense to find that [p]etitioner's custodial rights were not violated when [r]espondent took [the child]; she ceased to be able to take care of her child or make any decisions regarding his upbringing whatsoever." (emphasis omitted)), *aff'd sub nom., Palomo v. Howard*, 812 F. App'x 155 (4th Cir. 2020).

Thus, petitioner has demonstrated by a preponderance that he had custody rights under Colombian law, including the ability to participate in deciding L.C.'s residence and make decisions about L.C.'s upbringing.

### b.  Article 110

Respondent's argument that petitioner's consent to relocate L.C. was unnecessary pursuant to Article 110 fails to move the needle. Respondent presented evidence in the form of her Colombian lawyer's testimony that respondent could leave Colombia with L.C. without petitioner's permission because she had a certificate of United States residency and because respondent held physical custody over L.C. pursuant to the Divorce Decree. *See* Tr. 195:18–196:7. And in respondent's view, the Divorce Decree—and its conferral of physical custody—controls and supersedes petitioner's *patria potestad* rights.

*See* Tr. 304:22-305:5. Petitioner presented evidence in the form of his expert witness's testimony that Article 110 does not permit a parent to unilaterally relocate a child because "the basis of that [A]rticle is that the child has already established a habitual residence abroad so the child is just going back to where he or she has his habitual residence." Tr. 126:3–6. In other words, "it is not permission [for] the parents to relocate because the [A]rticle assumes the child is already relocated[.]" Tr. 126:6–9. Moreover, Ms. Jimeno testified that Article 110 does not override a parent's *patria potestad* rights, including their right to object to a child relocating. Tr. 126:10–12.

The Court agrees with petitioner's view. For one, the Court observes that a removal is not wrongful under the Convention "if one parent has lawful authority to *change the residence* of the child and doing so will not breach the other parent's custody rights[.]" *Ozaltin*, 708 F.3d at 367 (emphasis added). Respondent has not established that Article 110, which provides an exception for children to leave Colombia without one parent's consent, necessarily equates to authority to change that child's residence. *See* Tr. 126:3–9 (petitioner's expert witness testifying that Article 110 contemplates a child returning to his country of habitual residence and thus not needing both parents' consent); *see also Giampaolo*, 390 F. Supp. 2d at 1279 (explaining that even where "the child leaving Argentina technically was not in violation of [p]etitioner's rights," the "[c]hild's removal breached [p]etitioner's rights to exercise *patria potestas* over the [c]hild" because "a parent having *patria potestas* over a child must expressly authorize his or her child to change the place where he or she resides") (applying Argentinian law); *see also Tatari II*, 2025 WL 327984, at *8 (explaining that the Convention "divides rights a parent may have into two categories: rights of custody and rights of access. Rights of custody include rights relating to the care of the person of the child and, in particular, the right to determine the

35

child's place of residence, while rights of access include the right to take a child for a limited period of time to a place other than the child's habitual residence").

Thus, even if respondent were lawfully permitted to leave Colombia pursuant to Article 110—which, for the avoidance of doubt, the Court need not and does not address—petitioner has nevertheless shown by a preponderance of the evidence that by seeking to reestablish L.C.'s residence in the United States, respondent breached petitioner's custodial rights protected by the Convention. *See Giampaolo*, 390 F. Supp. 2d at 1279; *see also Vale*, 538 F.3d at 586 (holding that even though mother had physical custody of child, father had prima facie right to have child returned because he held *patria potestas* rights under Venezuelan law and explaining that "[t]he rights and duties of *patria potestas* are so extensive that a parent given them is thereby denoted a fit custodial parent[,] . . ., even if, when both parents are holders, one is likely to have physical custody."); *Whallon v. Lynn*, 230 F.3d 450, 459 (1st Cir. 2000) ("[T]he evidence of *patria potestas* rights under Mexican law leads us to conclude that [the petitioner's] rights were rights of custody under the Convention. While [the respondent] had actual custody of [the child], both parents exercised *patria potestas* rights over [the child]. Indeed, to date no Mexican court has given [the respondent] exclusive custody or denied [the petitioner] *patria potestas* rights over [the child]."); *Diaz v. Rios Ibarra*, No. 19-cv-03183, 2019 WL 4394491, at *9 (D. Az. Sep. 13, 2009) ("*Patria potestas* is more than the right to visit the child or take the child for a limited period of time. It is the right to raise one's child, which includes the ability to make decisions for the child.") (applying Mexican law).

\* \* \*

Accordingly, the Court finds that petitioner has met his burden of proving by a preponderance of the evidence that L.C.'s removal was in breach of petitioner's custody

rights under Colombian law. *See Abbott v. Abbott*, 560 U.S. 1, 19 (2010) ("[T]he Convention uses the unadorned term rights of custody to recognize *all* the ways in which custody of children can be exercised through a flexible interpretation of the terms used, which allows the greatest possible number of cases to be brought into consideration.") (emphasis in original).

### C. *Exercising Rights*

Respondent concedes that petitioner was exercising his custody rights at the time of removal. *See* Respt's Pretrial Br. 4, ECF No. 46. Nevertheless, the burden lies with petitioner, which he has met. Petitioner was exercising his custody rights at the time of the unlawful removal including because he (1) was actively visiting L.C. and taking him to extracurricular activities in Colombia, *see* Tr. 45:16–47:4, 54:16–55:15, 57:10–23, 58:14–22; (2) refused to consent to L.C. moving to the United States, *see* Tr. 40:14–16; and (3) filed the instant Petition the week after he found out respondent had removed L.C. to the United States, *see* Tr. 58:23–59:12; Pet.; *see also Lukic v. Elezovic*, No. 20-cv-03110, 2021 WL 466029, at *7 (E.D.N.Y. Feb. 9, 2021) ("The standard for evaluating whether a petitioner is exercising custody at the time of removal is fairly lenient. A person cannot fail to exercise his custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child.").

*     *     *

Accordingly, the Court finds that petitioner has met his prima facie showing that L.C. was wrongfully removed to the United States on December 3, 2025. Respondent did not present evidence as to any affirmative defenses at the Hearing and, as such, return of L.C. to Colombia is required pursuant to the Convention. The Court notes that the parties find themselves once again in need of judicial intervention to resolve a challenging and

personal decision regarding where and under what conditions L.C. will live. This is, of course, a difficult decision for all involved. Still, as this Court previously explained, "the Convention [does not] task the Court with resolving this custody dispute based on the best interests of the child—those are arguments and questions for another court." *Restrepo I*, 2025 WL 939294 at *14.

## CONCLUSION

For the reasons stated above, the petition is **GRANTED** and the child is ordered returned to Colombia. The Clerk of Court is respectfully directed to enter judgment in favor of petitioner. However, enforcement of this judgment shall be administratively stayed until April 16, 2026, to allow respondent to seek a stay from the United States Court of Appeals for the Second Circuit. Barring such a stay, the parties shall submit a proposed order of return, including precise travel details, by 12:00 p.m. on April 23, 2026. Petitioner is directed to confer with respondent and, to the extent possible, come to an agreement as to the proposed travel details.

SO ORDERED.

    */s/ Natasha C. Merle*
NATASHA C. MERLE
United States District Judge

Dated:    April 9, 2026
        Brooklyn, New York